CLYDE R. CUMMINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14688.   Promulgated March 26, 1931.

*Claude W. Dudley, Esq.*, for the petitioner.
*Hartford Allen, Esq.*, for the respondent.

**OPINION.**

VAN FOSSAN: The only question at issue in this proceeding is whether or not in the year 1921 the petitioner received the profits of $92,401 through the liquidation of The C. R. Cummins Coal and Mining Company.

The coal company owned the coal mining operation in southern Indiana. It had no funds of its own with which to purchase the coal land or to operate the business, but had borrowed from the contracting company the entire amount required in the enterprise. The property mentioned constituted its entire assets. In May, 1921, the coal company sold the property to George A. Enos for $250,000, of which $100,000 was in cash and the remainder in notes. The cash payment was made directly to the contracting company. Likewise, the note for $25,000, due August 1, 1921, was payable to the contracting company. The three notes due in one, two and three years from date, respectively, and aggregating $125,000, were made payable to the petitioner. The designation of the petitioner as payee was made on the advice of his attorney, but for an unexplained reason. The petitioner received the three notes on behalf, and for the benefit of, the contracting company. He promptly endorsed them to the corporation and that company ultimately received the

proceeds thereof. Without the petitioner's knowledge or authority and under a misapprehension of fact the contracting company's bookkeeper credited his account on that company's books with the face value of the three notes payable to him.

We have determined that at the time of their execution and while they were in the possession of the petitioner the three unsecured notes in question had no readily realizable or fair market value. This conclusion is based both on the fact that petitioner unsuccessfully tried to discount the notes or to pledge them as collateral and on the unequivocal testimony of qualified witnesses. The situation is quite similar to that under consideration in *Ed Foster et al.*, 19 B. T. A. 958, where we said:

> The note in question was property received in exchange for other property within the meaning of the above statute, and it is to be treated as though it were cash "to the amount of its fair market value, if any." What, then, was the fair market value of the note? The evidence discloses that the holder of the note, as soon as it was received, tried repeatedly to sell it to banks and moneyed men in the locality, but could not obtain a purchaser. This appears to have been due to the fact that the makers of the notes were extensively engaged in speculative enterprise, and to the further fact that the banks were already carrying large amounts of other notes given by these same makers. Whether the note might have found a ready market at another time, under different conditions, it is unnecessary for us to decide. We are here considering a situation that arose, and conditions that existed, in 1920. It is sufficient that at that time and under those conditions the note was not salable to the banks and other purchasers of securities with whom the petitioner was in a position to deal and to whom the note was offered for purchase. *Miami Beach Improvement Co.*, 14 B. T. A. 10. We are satisfied that within the meaning of the statute the note had no fair market value in 1920. And this conclusion is not affected by the probability that the amount of the note might have been collected, after maturity, by means of a lawsuit against one of the makers, for, as we interpret the statute, the "fair market value" of property at any given time is not to be based upon and fixed by the probable outcome, at some future time, of more or less lengthy legal proceedings. In our opinion the note in question did not constitute income for the year 1920 and should not have been so treated by the respondent.

In the instant case the facts were almost identical. The bankers who refused to discount the notes or accept them as collateral, even for a small proportion of their face, gave as their reasons the fact that the maker of the notes was heavily involved and that in 1921 the coal industry, in which he was engaged, was at a low ebb. They expressed the positive opinion that the notes at the time of receipt had no market value. Hence, the petitioner is not chargeable with taxable income by reason of their receipt in May, 1921, regardless of whether or not they constituted a liquidating dividend from the coal company. An erroneous bookkeeping entry can not create a value where none exists. The fact that the three notes were later endorsed by the Enos Coal Mining Company, on September 9, 1921,

has no bearing on the situation since the petitioner had endorsed the notes and delivered them to the contracting company some time prior to that date.

While it is not essential to decide the question directly, yet we may observe that the petitioner owned no stock in the coal company, the coal company had no assets of its own, and the proceeds of the sale to Enos were assigned to the contracting company because it had financed the purchase of the Indiana property. It would seem, therefore, that the petitioner had no personal interest in the sale to Enos, but was acting wholly on behalf of the contracting company. His designation, therefore, as the payee of the notes in question, was not made as a stockholder of the coal company, but rather as a representative of the contracting company.

*Judgment will be entered under Rule 50.*